Abdullahi Jama v. William P. Barr Okay, Ms. Hotung, I think you're going first. Ms. Hotung, can you hear me? I can. Can you hear me? Yes, we can hear you. Proceed. I think you're going first. Tell me if you're not, of course. I believe I am. Proceed. Okay. Good morning, Your Honors. May it please the Court. Catalina Anne Hotung for Petitioner Mr. Abdullahi Jama. Mr. Jamale's briefing to this Court asserts a number of distinct errors in agency decisions denying him both CAT and withholding protection, and these errors should at least require remand. But our plan today, unless the Court directs otherwise, will be to focus primarily on the CAT claims. At least a remand on CAT is necessary for three related but alternative reasons. One, lack of substantial evidence. Two, violation of an agency regulation. And three, closely related to that reason, cheddary remand for clarification and appropriate application of correct standards. To elaborate, first, as we argued in our 28-J letter regarding Nisrallah, Mr. Jama's position is that the evidence of future torture and acquiescence in this record as a whole is compelling, and the agency denial of CAT lacks substantial evidence. This could warrant reversal and remand. However, the Court need not rule on this ground for Mr. Jama to prevail. As to the second point, the agency violated its own regulation requiring that it consider all evidence relevant to the possibility of future torture. The IJ here never identifiably analyzed why the potential dispositive, extensively corroborated expert opinions of Mr. Jama's medical witnesses did not establish his statutory eligibility for protection in relation to the minimal evidence the IJ did mention. If the Court agrees, it should reverse and remand for the agency to apply the correct regulatory standard in the first instance. Third, while Mr. Jama contends the regulatory violation is clear, a cheddary remand would be appropriate if this Court has any substantial doubt as to whether or not the agency violated this regulation. This would be a separate and independent basis for the Court to remand, rather than to rule without clarity as to the reasoning of the IJ. This option would align with the Court's precedent in Garcia Mata and also squares well with the BIA's new intervening national precedent, JGT, addressed in our 28J letter of October 20th. The record in this case features not one but two medical experts whose testimony was not at the margins of the legal standard for torture protection, but rather provided a set of opinions that would satisfy the legal standard on its base. These features of Mr. Jama's case are what distinguish it and should have required the IJ to identifiably perform a more particularized comparative analysis, not merely mentioning supposedly contrary evidence, but actually addressing and explaining why and indeed even whether she believed the minimal evidence that she did point to was somehow more persuasive then and capable of outweighing the far more extensively corroborated and potentially dispositive expert opinions Mr. Jama offered. I'd like to ask you about the competing evidence that was presented. Help me understand what was not institutions that would provide a safe environment for someone like Mr. Jama. It was unclear to me whether the IJ was referring to multiple mental health institutions that are now available since they have taken a more serious approach toward treatment of mental ill. Can you help me understand what the countering evidence is? Sure. The IJ relies pretty heavily on a three-page document that was provided that discusses the chain-free initiative that started a couple years ago in Somalia, and she relies on that heavily to make the conclusion that these efforts have essentially fixed the problem in Somalia. In addition to that, she attributes certain efforts that are being done in Somalia to the government as helping address the issue. However, those efforts are actually coming from international sources, so not only does she amount of evidence to this three-page document. Did she find that there were additional hospitals that were chain-free? What is the record on the availability of chain-free institutions if someone like Mr. Jama were to be placed there? They are very, very few. I believe only one is chain-free at this time. However, it's a private facility and it would be highly unlikely that Mr. Jama would be institutionalized in that facility. So the new facilities that the IJ refers to that have been established in Somalia are not chain-free? Is that what the record shows? The majority of them are not chain-free, and even those that attempt to be chain-free, because of the stigma in the country, it's incredibly difficult to actually control whether or not the workers within the facilities are engaging in chaining practices. And does that include the six mental health hospitals in Somalia, three of which are in six hospitals as well, that we just don't know if they're chain-free? Yeah, I believe even though he has those six centers, only one of them is fully chain-free. And I do remember from the record that some of those actually had really horrific conditions, including overcrowding, poor hygiene, lack of adequate trained staff, forced seclusion, prolonged isolation. And there were actually instances of chaining in those facilities as well. And the majority of private centers don't actually keep clinical records, so there's no real record of what people should be taking in terms of medication. They're just sort of force-fed medication. And did you say these are private? All six of these are privately run? Yes, Your Honor. Thank you. Sorry. So these features of the potentially dispositive information that Mr. Jama's case has distinguish it and should have required that the IJ perform a more particularized comparative analysis. And while this court has not issued a precedent specific to the analysis of expert testimony in the CAT context, Mr. Jama's brief cited to the Ninth Circuit COLE decision, which requires identifiable engagement by the IJ with expert testimony of the exact kind that Mr. Jama brought to his hearing. The absence of such engagement requires at least a remand in this case. The government's answer brief actually criticized us for our use of COLE and our reliance on the methodology in COLE. But since the board itself in JGT has effectively adopted COLE's methodology as a national agency rule that indicates Mr. Jama's arguments in his brief to the BIA and the circuit, that would justify that the case be remanded. Okay. What's your best circuit authority for your position? I guess the best eighth circuit authority, Your Honor, would be Kassim v. Barr. That was about a regulation violation by the agency and the court reversed and remanded. That was also in a CAT context. Tell me again the name. I heard the versus bar, but what's the petitioner's name? Kassim. K-A-S-S-I-M. Okay. And is it in your brief? I don't believe so. Is it in the other side's brief? We could check. Don't, don't, don't. And you can look if it's handy, but so don't be, don't be particularly worried about that. We'll find out. Is it spelled with a K? Yes, it is, Your Honor. Good. Okay. Proceed with your argument. I suppose one, we did also cite Garcia Mata, which is also in the circuit, and that is also another instance of a remand. However, in that case, it was really unclear in the, the IJ's sorry, the Eighth Circuit was unable to really determine whether or not the violation actually occurred. And the case was remanded for the IJ to properly and clearly apply the standards for review. And is that what you're requesting here in this case is a remand? Yes, Your Honor. At minimum, a remand would be warranted in this case. And it's really deferral, right, that you're, is the government right to make the point that you really would like deferral? Is that, is that the, is that the real remedy? We do stand by all of our arguments in the briefing, but we are focusing on, on the deferral of CAB. Okay, great. And you aren't your rebuttal if you wish to reserve it from now on. You can reserve as much or as little as you want. Okay. I, I will reserve then. Okay, great. Thank you very much, Ms. Houghton. Mr. McLaughlin. Good morning, and may it please the Court. I am Andrew McLaughlin. I represent the Respondent Attorney General of the United States in this case. I'm going to have to disagree with Petitioner's Counsel. In this case, the immigration judge did a masterful job of evaluating thousands of pages of evidence and arguments and testimony, and determined and explained why the petitioner had not met his burdens to demonstrate that his aggravated assault conviction was not a particularly serious crime, which bars him from withholding of removal, and that he failed to demonstrate that it was not, that it was more likely than not that he would be tortured in Somalia with the acquiescence of the victim. I'm going to focus again, as Petitioner has done, on the intervention against torture arguments, because that's where she's gone. But obviously, if you have questions about the other arguments, I'd be glad to address those as well. For the most part... I do want you to leave just a little bit of time to talk to me about the mental health records issue, but go ahead. Talk about her issues first. It's better for continuity. Okay. As I see it, there are three arguments that are out there with respect to the Convention Against Torture, and they are... I'm going to describe them differently than Petitioner did. One is this question of aggregation, which is dealt with in her brief. She did not address it, Petitioner did not address it in the argument. But the question of aggregation is one that are required here, and the government doesn't dispute that aggregation is required. The first kind of aggregation is between different sources of torture. In this case, you have essentially two different sources, broadly alleged. One is the concept of what happens in a mental health facility versus what Al-Shabaab will do. Now, let me point out here, this is an example of a case where those two are mutually exclusive, as far as I can tell. There is no allegation that Al-Shabaab can torture people in mental health facilities, and there's no allegation that there will be torture as a result of mental health by Al-Shabaab. So those two are distinct, and there's some case law out there and other circuits that say you need to add those two things together. That doesn't apply here, and that's why that didn't happen here. The other aggregation rule is that in any particular situation, you need to consider the total value of all circumstances that lead to a conclusion of torture. And you have a variety of those kinds of situations being tossed out here, but the primary one that is addressed in the evidence here, and the one that is dealt with in the most detail and perhaps is, and honestly, it's directly argued by a petitioner as the form of torture, is chaining. So the question is, immigration judge, draw all those things together and address them individually and as a whole, and the answer is absolutely, explicitly, and in detail. And therefore, substantial evidence supports the immigration judge's factual determination. Now, petitioner has framed that as a legal issue, but as we both addressed in our supplemental authority letters directed by the court, this can be addressed as a court has jurisdiction to address the substantial evidence question here with respect to the deferral of removal as a protection from torture as well. Okay, so let's look at the experts. Let's examine that claim that the immigration judge failed to contend with the actual testimony of the experts. Absolutely simply wrong. First of all, the immigration judge explicitly dealt with both experts in our decision, and the board of immigration appeals mentions both in the decision as well. But the more important point here is the detail that they got into. Now, recall that experts are not dispositive. Experts don't define torture. There's a lot of things experts don't do, and it didn't happen in this case. But what you do have here is a lot of facts being provided by the experts, excellent facts, and you have a couple of opinions being provided by the experts with respect to a likelihood of chaining if the petitioner is placed in a mental health facility and perhaps what kind of mental health facility that's going to be. How much do you think that the IJ relied on, or how much emphasis did the court put on the idea that there were alternative places for Mr. Jama if he were to be institutionalized that did not require chaining? There were several things that occurred that the IJ identified in the record that undercut the claim of the likelihood of chaining. And those things were, first of all, the likelihood at all that this person would be placed into a facility at all, in any case. Both of the declarations of both of the experts state that the way that this person's going to get into a mental health facility is that the government's going to pick them up and put them there for the most part. That's what the experts said in their declarations. However, when cross-examined about this, Dr. Jama, who was the only one who was actually available for cross-examination, said the normal way that people get into mental health facilities is their families put them there. And he had no evidence and no information and no recollection of any situation in which the government had ever placed somebody in a mental health facility. And that only left this question of whether a good Samaritan would do it. And that severely undercuts these assumptions that the experts made about the likelihood that he would be placed in a facility at all, and therefore, the likelihood of chaining. Now, with respect to the next step, and each of these steps has to be greater than 50%, and as an aggregate, it has to be greater than 50% based on the standards that are set by the board. On the next step, the likelihood of chaining, the immigration judge basically accepted that there's a likelihood of chaining. However, the likelihood of chaining is undercut by two things. One is there's an increase in facilities that don't chain, and there were a number of them cited. And the second is that the government is now actively engaged in two aspects. And this reflects on a question you asked earlier. One is increasing mental health facilities in general, but the second is increasing the quality of mental health nationally. And the immigration judge referred to both of those things. But both of those things simply undercut the commissioner's ability to support his overall claim that there's a likelihood of torture. Would it be fair to say that sort of at a base level, there wasn't a lot of dispute that if chaining went on in the ways that were described in the record, that that could qualify as the kind of suffering for torture? It was just the ruling was more whether the likelihood of that happening to this particular person, given all of the information that you've just described? There wasn't a lot of discussion about, and frankly, there is zero evidence in the record about chaining being torture. Petitioner actually cites on page 18, a string site of none of them. None of those locations actually mention the definition of torture. None of them mention severe pain or suffering. None of them mention any of those things. So the fact is, there isn't any evidence in the record that chaining is torture. But the immigration judge didn't really focus on that. Instead, the immigration judge focused on four points. And these are the four key points that define torture. This is what the definition of torture is all about. The immigration judge says there is no evidence in the record to suggest that the government intentionally tortures as a form of punishment. The four points there being the torture point, that is what amounts to severe pain and suffering. The intentionally point, that is, it has to be intentionally inflicted in order to be torture. That has to be done as a form of punishment. That's the third point. And the fourth is that the government either has to do it itself or acquiesce to it in the sense that they know it and have an obligation to do something about it and don't do anything about it. And there's literally no evidence in the record. And that's what the immigration judge essentially combined. All of those things, all of those questions, what's going to happen, you know, is Mr. Jama being going to be placed in a facility or not? That's where the petitioner's testimony, the expert testimony was actually substantially undercut, whether or not there's going to be chaining in that facility. And then the question became, is the expert's testimony even up to date? The immigration judge and the government pointed out that the evidence that they were relying on was in fact outdated. Does that mean that there isn't more likely than not, if the person gets placed in a facility, it's more likely than not that they're going to be chained? The immigration judge didn't reach a finding about that. And I honestly think the immigration judge believed that if a person gets placed in a facility right now, that they will for some period of time, whether it's going to be prolonged and for what period prolonged, there isn't any evidence of the record. But I think the immigration judge believed that. The problem that the immigration judge found was a complete absence of proof about the likelihood that that will result in something amounting to torture. The likelihood that the government will, whoever is doing it, will intentionally inflict it. Mr. McLaughlin, your time's running out. I do want to ask you about an issue raised, not in the argument, but definitely in the briefs, and that is mental illness in determining the particularly serious crime. Okay. This is, let me ask a question. It'll direct the inquiry a little bit. All right. And so, at the bottom of page three of the BIA decision, the board says, we recognize the respondent's argument to take into account history of mental health. Then they put a footnote claiming that it's their rule that aliens' mental health is not considered, like it's a flat rule in assessing particularly serious crime. And then they say, we'll assume it's relevant, and they go ahead and talk about it on the next page. So, did they consider it or not? Both. First of all... Wait, wait, wait, wait. Did they consider it or not? The answer can't be both, Mr. McLaughlin. They decided in the alternative. They said... Okay, that's a different question than whether or not. Just because our precedent says we don't consider this, and there's good reasons for that, and I can talk about that. Then they said, but look, the immigration judge specifically said the petitioner hasn't identified any reason why his mental condition would impact the seriousness of his crime in this case. And in doing that, they were simply affirming what the immigration judge said. So, yes, they affirmed the finding of the immigration judge that it was irrelevant because petitioner hadn't identified any reason that it should impact the particularly serious crime determination. I think Judge Shepard's trying to ask a question. Oh, I'm sorry. I can't hear you. The particularly serious crime determination is in its discretionary determination for which the board does de novo review, the ultimate determination. Now, the factors that are not a matter of de novo review. Let me take a moment here to point out, just to talk about the board's decision in GGS where they said that mental health is not, shouldn't be further litigated in the immigration court because that issue has been dealt with by the criminal court. The Ninth Circuit objected to that, disagreed with that for a couple of different reasons and a couple of different ways that are simply wrong. But let me explain what the board is saying. Mental health comes into play as negating various elements involving intent. That's considered in the criminal case and therefore that is the nature of the offense that the immigration judge is required to consider. The elements of this crime did not require specific intent and therefore that's the nature of this offense. It's also considered in the criminal case as a matter of mitigation on sentencing, assuming it's raised. In this case, it wasn't raised because petitioner simply said these events never took place. So it never came up in that context, but it's already been dealt with in the criminal courts in every rational, reasonable, relevant context and there's no reason to revisit that in the immigration courts, particularly that aren't equipped to deal with, you know... Okay, you're sticking up for the rule and not the alternative finding, right? The alternative finding is 100% correct. That is... Wait, wait. Answer my question. What you just gave us was arguing for the rule in footnote two. That's correct. In this case. Does that also apply to the citation to NAM and what they say on the next page, including the de novo review, including the mental health? Yes. The board's findings with respect to its review of the particularly serious crime determination, including mental health, is also correct. The immigration judge found that petitioner had raised no issue, presented no evidence regarding how this wasn't considered in his criminal case, and therefore that finding is also correct. Okay. Please conclude. The immigration judge field did an incredible job in this case. The court should find that the agency made no legal errors and deny the petition for review. Okay. Thank you, Mr. McLaughlin. Ms. Houghton, you're back to you. Thank you, Your Honor. First, I would like to address some of the points as to the torture. There is extensive evidence as to highly specific factual predictions by both experts as to the torture. One of them said it would be an 80 percent chance that he'd be institutionalized and an 80 to 90 percent chance that he would be chained. And the other said there'd be a 75 percent chance of him being chained for prolonged periods. Did either of those people say it was torture? There's been multiple reports by international organizations specifically calling it out as torture. We believe in this record. Is it in this record, those multiple reports that you referred to? Yes. Yes, Your Honor. Thank you. Go ahead with your argument. Okay. I believe I'd like to touch on GGS and the mental health components since we were just discussing that. We do believe that GGS is an unreasonable rule and that mental health considerations should be taken into account when looking at whether a crime is a particularly serious crime. Counselor, let me interrupt you because the position here today, now we've had a little bit different position this week in a different case, but we won't go there. The position in this case is that there's an alternative finding that we did consider it, and that's pages three over to four of the BIA's decision. How do you respond that, it was considered here? Well, Your Honor, the immigration judge didn't actually make a finding on whether, I mean, on that point. So the board's alternative analysis on that can't stand on its own. Okay. What about this? The board says it's they know we're reviewing and they can do it. Are they right or wrong? I believe they're incorrect on that point. The immigration judge is the only fact finder in this chain. And I get your general point, but now they'll call it some kind of legal conclusion. Why is it not a legal conclusion? I'm sorry, a legal conclusion that... Yeah, right, right. They're sentenced, considering all the reliable information, including the response mental health history, upon our de novo review, we conclude, they're trying to say it's a legal conclusion, that respondent's crime was a particularly serious one, is ineligible for removal. I'm almost quoting every word. Do they have authority to make that sentence or not? They do not have the authority to make that finding. Only the immigration judge can make the finding on that. Okay, what Eighth Circuit law tells us that that is a finding and not a conclusion? I believe that whether or not there is sufficient evidence or insufficient evidence is a finding in and of itself. Because there is a lot of evidence in the record to show that Mr. Jama has severe mental health issues. And we do think that mental health should be taken into account when mitigating criminal offenses and should be taken into account when assessing the nature of a crime. Not to beat the point, but at the top of the page, they say that your client has not submitted sufficient evidence to demonstrate. Did the I.J. say not sufficient evidence? The I.J. didn't attempt to perform a predicate fact finding on that point because she categorically excluded mental health from the analysis. You don't know where it is in the, it's got to be page 11 or somewhere in there. They do cite the general, you're quite correct that the I.J. on page 10 just cites the general rule. So the BIA is trying to clean up and I guess the issue is whether the BIA can clean up that way. And Ms. Houghton, you've made your point, the other side's made their point. Do you want to conclude? I'm sorry, Your Honor, were you, did you want me to elaborate on a question? No, it's time to conclude. Okay, well for the, in response to all the arguments that we have made, we do believe that the decisions made were lacking so much clarity that this court should at minimum send the case back to the immigration judge so they can clarify their and apply the correct standards. Thank you very much for your argument here today, both of you. And case number 19-2250 is submitted for decision by the court.